# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6853 | **DATE** | 2/28/2002 |
| **CASE TITLE** | Wade v. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, plaintiff's motion for summary judgment [21-1] or remand [21-2] is denied and defendant's motion for summary judgment [25-1] is granted. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | | Document Number |
|---|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | | |
| | No notices required. | | | | FEB 28 2002 | | |
| ✓ | Notices mailed by judge's staff. | | | | date docketed | | 30 |
| | Notified counsel by telephone. | | | | | | |
| | Docketing to mail notices. | | | | docketing deputy initials | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | | 2/28/2002 | | |
| | Copy to judge/magistrate judge. | 02 FEB 29 AM 1:07 | | | date mailed notice | | |
| KF | courtroom deputy's initials | Date/time received in central Clerk's Office | | | KF mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELAINE L. WADE | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 00 C 6853 |
| vs. | ) |
| | ) |
| JO ANNE B. BARNHART, Acting | ) |
| Commissioner of Social Security | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

DOCKETED

FEB 2 8 2002

Michael T. Mason, United States Magistrate Judge:

The plaintiff, Elaine L. Wade ("Wade") has brought a motion for summary judgment seeking judicial review of the final decision of defendant Jo Anne B. Barnhart,[1] who denied Wade's claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d), 1382(c). Wade now appeals that decision in federal court as permitted by Section 405(g) and Section 1383(c)(3), which grant federal courts the power to review the Social Security Commissioner's final decisions. Both sides now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, with Wade alternatively requesting a remand for a new hearing. For the foregoing reasons we affirm the decision of the Commissioner.

**Procedural History**

Wade filed for DIB and SSI[2] benefits on July 31, 1997, asking for a period of

---

[1] At the time this matter was filed, the Commissioner of Social Security was Larry G. Massanari.
[2] Although Wade's SSI application is absent from the Administrative Record, other evidence indicates that Wade had applied for SSI. (R. 18; 33-43).

disability dating back to May 12, 1997. (R. 45-47; 33-43). Wade's claim was denied initially and on reconsideration. (R. 33-36; 38-43). On October 27, 1998, Wade, represented by counsel, testified in a disability hearing before Administrative Law Judge ("ALJ") Bonny S. Barezky regarding the denial of her claim for benefits. (R. 15). On January 6, 1999, ALJ Barezky issued a written opinion denying plaintiff's claim. (R. 15-29). In her opinion, Barezky found that Wade was capable of performing a full range of sedentary work and was not "under a disability" as defined under the Social Security Act. (R. 22, 27-28). On March 30, 1999, Wade filed a timely request for the Appeals Council to review the ALJ's decision. (R. 13-14). The Appeals Council denied Wade's request for review on July 7, 2000, stating that there was no basis under the Social Security Administrations regulations to grant her request for review of the ALJ's decision. (R. 6-8). Thus, the decision of ALJ Barezky became the final decision of the Commissioner of Social Security. See *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); Reg. § 416.1481

**Plaintiff's Testimony**

At the time of the hearing before the ALJ, Wade was a forty-seven year old[3] woman who had obtained her GED and completed a program for Certified Nurse Assistants. (R. 74-75). Wade testified that two weeks prior to the hearing she had started a part-time job driving people to their doctor's appointments. (R. 214-15). She stated that she drives a total of about three hours in an eight-hour day and earns forty dollars per day. (R. 215). In between dropping people off at the doctor's office and picking them up, Wade goes

---

[3] There appears to be some discrepancy in the record as to the plaintiff's age. Plaintiff stated she was born on 06/16/1950 in her application for DIB (R. 44), and stated she was born on 06/16/1951 in her testimony before the ALJ. (R. 214).

home. (R. 216). Prior to transporting people to the doctor, Wade worked as a certified nurse's assistant ("CNA"). (R. 216). Wade stated she had been a CNA for thirty years, lifted approximately eleven patients a day, and was on her feet for about six and one-half hours per eight-hour day. (R. 216-17). She testified that she had pain and swelling in her knees and feet and that both of her hands "get stiff and the joints just stick, you know. And it hurts when you pull them out." (R. 217-18). Wade also stated that she gets sharp pains in her wrists and that her worst problem was "just waking up in the morning and you're [sic] having pain, you know. Just getting up, it's pain. It's painful in the back, painful in my joints." (R. 218-19). Wade said she used to take a lot of painkillers but now she only takes one which does not completely relieve the pain. (R. 219). She also has trouble sleeping at night. (R. 219).

Wade explained her back pain gets really bad about twice a year, compelling her to see the doctor. (R. 221). At other times during the year, Wade has a lingering pain in her back and also gets a "burning sensation sometimes" that "burns up and down the back of the legs." (R. 221). She told the ALJ that "maybe two or three times a month" her knees would swell up and they would stay swollen "two or three days with medication." (R. 221). Wade testified that she did daily routine housework such as sweeping[4], doing one or two loads of laundry, or making "instant" meals[5]. (R. 222-23). She testified that she would begin to get pain in her legs and they would begin to swell after doing the laundry because she had to go up and down the stairs two or three times to the basement. (R. 223). Wade told the ALJ that she reads a lot and when she is reading or watching television she sits

---

[4] Wade stated that she may sweep for up to 20 minutes at a time. (R. 222).
[5] When making meals, Wade testified she is on her feet in the kitchen for about 30 minutes. (R. 223).

with her legs elevated at the same height as her waist. (R. 223-24). She testified that she has problems remembering what she told her child and that she gets headaches four or five times a week and they last until she is calm enough to fall asleep. (R. 225-26). Wade stated she has a problem with stress and suffers from crying spells, nervousness, frequent headaches, insomnia, and worrying about her problems. (R. 228-29). She gets back spasms two or three times a year which force her to go to the doctor. (R. 225).

**Plaintiff's Medical Examinations**

On April 7, 1997, Wade sought treatment at the emergency room of St. Francis Hospital for chronic low back pain and osteoarthritis. (R. 103). She reported that she had a fifteen-year history of osteoarthritis, low back pain for the last ten years and that it worsened when bending. (R. 104). The physical exam revealed that Wade's lumbo-sacral spine was tender and painful when bending. (R. 104). She also reported pain that radiated up her thighs, but not to her abdomen. (R. 104). Wade told the emergency room staff that she worked at St. Francis Extended Care where she lifts many patients. (R. 105). The medical reports indicate that Wade was given an intramuscular injection of Vistaril and Demerol while in the hospital. (R. 105). The physician gave Wade a prescription for Vicodin to be taken for pain as needed and advised her to rest for two to three days. (R. 104-06).

On December 29, 1997, Wade was examined by Edith Panopio, M.D., at the request of the Social Security Administration. (R. 107). Wade related problems with diabetes, hypertension and arthritis. (R. 107). Wade told Dr. Panopio that in 1978 she had her medications adjusted because her blood pressure was high and she was getting headaches. (R. 107). Wade also told Dr. Panopio she used a cane, but did not bring the

4

cane to the examination. (R. 108). Wade complained of stiffness in her hands and shoulders and pain in her spine that comes and goes. (R. 108). Dr. Panopio made the following conclusions: (1) Wade was moderately obese; (2) she had good handgrip bilaterally with normal finger dexterity; (3) she had no limitation on the range of motion in her cervical spine; (4) no clinical evidence of end organ damage as a result of hypertension; (5) no end organ damages as a result of diabetes at the time of examination; (6) There was pain and stiffness in the left knee with voluntary restriction due to alleged pain; (7) x-rays of the left knee showed moderate degenerative joint disease with joint space narrowing, articular thickening or irregularity, subarticular cystic changes and osteophytes, and calcification of the left knee compatible with osteochondromatosis; (8) mild limitation of range of motion of the lumbar spine with no evidence of nerve compression; and (9) Wade's gait was normal. (R. 107-112). Dr. Panopio noted there were no medical records available for her to review. (R. 111).

On December 31, 1997, Wade was treated at the emergency room of Roseland Community Hospital for complaints of pain on her right side that she had been experiencing for the past two weeks. (R. 135). A chest x-ray was taken and compared to a previous x-ray taken on May 26, 1994. (R. 144). The x-ray showed minimal osteoarthritic changes in the thoracic spine, no abnormalities in the abdomen, and no significant interval change since the May, 1994 x-ray. (R. 144). Against medical advice, Wade refused to stay at the hospital and left before treatment was complete. (R. 137-38).

On January 2, 1998, Wade again was treated at Roseland Community Hospital for complaints of elevated blood pressure and blood sugar. (R. 145-53).

5

On January 22, 1998, Julius Villaflor, M.D., a state agency physician, reviewed the medical evidence from Wade's December 29, 1997 consultative examination by Dr. Panopio and found that Wade could perform medium work[6]. (R. 113-20). With respect to postural or nonexertional limitations, Dr. Villaflor found Wade able to climb stairs, balance, stoop, and crouch frequently[7] and able to crawl and kneel occasionally[8]. (R. 115).

On February 12, 1998 Wade again went to Roseland Community Hospital for swelling under her chin and neck and was released fifty minutes after being admitted to the emergency room. (R. 156-58).

Wade had x-rays of her back taken on April 2, 1998 after complaining of back pain. (R. 125). The x-ray results showed "moderate narrowing of the L5-S1 disc space and minimal degenerative osteophyte formation [at the] L4-L5 level." (R. 125).

Wade was then hospitalized April 8-11, 1998 at Roseland Community Hospital for uncontrolled diabetes, uncontrolled hypertension, hypercholesterolemia, hypertriglyceridemia, hypomagnesia, exogenous obesity, and degenerative joint disease. (R. 160). Wade complained of feeling weak and dizzy as if she was going to pass out. (R. 163). A physical examination conducted by Dr. Arya, an emergency room physician at the hospital, found Wade to be conscious, alert, well-oriented to time, place, and person. (R. 160). Dr. Arya's examination also noted that Wade had peripheral neuropathy. (R. 160). However, peripheral neuropathy was not part of his final diagnosis. (R. 160). Dr. Arya

---

[6] Dr. Villaflor stated Wade could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand and/or walk 6 hours in an 8-hour workday, and push/pull limited only by the weight restriction on lift/carry. (R. 114).
[7] Frequently means occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous). (R. 113).
[8] Occasionally means occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous). (R. 113).

noted that the rest of Wade's physical exam was essentially unremarkable, except that she appeared to be uncomfortable. (R. 160). The doctor also noted that Wade had no history of abdominal pain, headaches or any other problems; he placed Wade on insulin to control her blood sugar. (R. 161, 163-64).

Two days after being discharged from the hospital, Wade was seen by Benajmin Toh, M.D., an internist, at the request of SSA. (R. 121-24). Dr. Toh conducted a physical examination of Wade and reviewed information sent to him by the Bureau of Disability Determination Services[9]. (R. 121-24). Wade told Dr. Toh her chief complaint "would be my diabetes and hypertension," and that she had had arthritis for the past twenty-five years and sometimes took aspirin for the pain. (R. 121). Wade also related to Dr. Toh that she does not use any assistive device for walking and last used a cane about a year ago when her left knee gave out on her. (R. 121). She explained to Dr. Toh that she quit her job as a CNA because it was "too much for me. Taking too much pain killers." (R. 122). She said the pain medication made her feel drowsy and sleepy. (R. 122). Dr. Toh found that Wade had a history of hypertension, diabetes, and arthritis. (R. 123). However, he also concluded Wade had full range of motion in her joints, normal grip strength and ability to manipulate objects, normal gait, and was capable of fully squatting with some complaints of pain in both knees after squatting. (R. 123). Dr. Toh also conducted a mental status examination on Wade and found nothing remarkable. (R. 123). He concluded the examination by asking Wade if all of her medical complaints were addressed and she replied affirmatively. (R. 123).

---

[9] It is unclear from the report what types of records were furnished to Dr. Toh.

On May 9, 1998 Wade was treated at the emergency room of Roseland Community Hospital for muscle spasms to the right side of the back which had been bothering her for the past two weeks and were now worse than usual. (R. 177). Wade's blood pressure was elevated at 194/109 and she complained of some nausea. (R. 178). She was diagnosed with a back sprain and prescribed Flexeril and Toradol. (R. 180). A chest x-ray was also taken and came back showing her heart and lungs to be normal. (R. 190). An electrocardiogram was performed on her heart and came back normal. (R. 191).

On June 8, 1998 Wade was treated at Roseland Community Hospital for carpal tunnel syndrome[10]. (R. 194-98). Pascual Sales, M.D., performed surgery on Wade's right arm and concluded Wade had "a markedly thick carpal tunnel ligament that is pressing on the median nerve as it goes through this area. There is some indentation of the median nerve." (R. 197). The pathology report following surgery indicated the presence of clinical carpal ligament tissue fragments in the tissue removed from Wade's right forearm. (R. 198).

**Standard of Review**

In reviewing the final decision of the Commissioner, this court must accept as conclusive the findings of fact made by the ALJ if they are supported by substantial evidence. Section 405(g). "Although a mere scintilla of proof will not suffice to uphold the Commissioner's findings, the standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a

_____

[10] Plaintiff asserts that she suffers from bilateral carpal tunnel syndrome. Although one of her medical charts shows a diagnosis of bilateral carpal tunnel syndrome (R. 195), four other medical records from the same date indicate a diagnosis of carpal tunnel syndrome to the right hand only. *See* R. 194, 196, 197, 199.

conclusion.'" *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1972). If the record contains such support, the court must affirm the decision of the Commissioner unless she has made an error of law. *Veal v. Bowen*, 833 F.2d 693, 696 (7th Cir, 1987). This court may not reweigh the evidence, re-evaluate the facts, or substitute its own judgment in determining whether a claimant is or is not disabled. *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ). *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). This court may not reconsider credibility determinations by the ALJ. *Prince v. Sullivan*, 933 F.2d 598, 601-02 (7th Cir. 1991). Thus, a plaintiff's proof must show that no reasonable person, based upon the record as a whole, could have found as the Commissioner did. *Rucker v. Shalala*, 894 F. Supp. 1209, 1213-14 (S.D. Ind. 1995).

## Analysis

Wade argues that the ALJ's determination that she was capable of performing a full range of sedentary work was not supported by substantial evidence and was premised upon legal error. Wade makes three main arguments in support of her claim. She first alleges that the ALJ committed legal error in assessing whether or not she suffered from a severe mental impairment. Second, she argues that the ALJ committed legal error in making her credibility determination, and third that the ALJ's determination that Wade could perform the full range of sedentary work was not supported by substantial evidence and is premised upon legal error.

To determine whether an adult claimant is disabled under the Act and thus entitled

to benefits, the ALJ must undertake a five-step process which assesses whether the

individual is unable to engage in any substantial gainful activity by reason of a medically

determinable physical or mental ailment.    Sections 423(d)(1)(A), 1382c(a)(3)(A).

Furthermore, an individual is considered disabled only if she is neither able to perform any

of her previous work or any other work existing in significant numbers in the national

economy. Sections 423(d)(2)(A), 1382c(a)(3)(B); Reg. §§ 404.1520(e), (f), 416.920(e)(f).

In making her determination, the ALJ applied the standard five-step process set forth in the

regulations, which required her to evaluate, in sequence:

    (1)    Is the claimant presently unemployed?

    (2)    Is the claimant's impairment or combination of impairments severe?

    (3)    Do his or her impairments meet or exceed any of the specific impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 which the Secretary acknowledges to be conclusively disabling?

    (4)    If the impairment has not been listed by the Secretary as conclusively disabling, given the claimant's residual function capacity, is the claimant unable to perform his or her past relevant work?

    (5)    Is the claimant unable to perform any other work in the national economy given his or her age, education or work experience?
          *Ward*, 2000 WL 1029170 at *4 *citing*, Reg. § 416.920(a)-(f); *Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Under the five part sequential analysis, "[a]n affirmative answer leads to either the

next step, or on Steps 3 and 5, to a finding that the claimant is disabled.  A negative

answer at any point, other than Step 3, ends the inquiry and leads to a finding that the

claimant is disabled." *Zalewski v. Heck*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  Wade's

argument focuses on step five of this inquiry.

In undertaking the five-step process, ALJ Barezky first determined that for the purpose of her opinion, Wade was not currently gainfully employed (step one).[11] (R. 20). Next, the ALJ determined that Wade suffered from the severe impairments of "diabetes mellitus, hypertension, obesity, right carpal tunnel syndrome, degenerative arthritis of the left knee, and osteoarthritis of the lumbar spine" ( step two). (R. 21). The ALJ found that Wade did not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (step three). (R. 22). At step four, the ALJ found that in spite of Wade's impairments, she still maintained a residual function capacity ("RFC") to perform a full range of sedentary work. (R. 22). However, she could not perform her past position as a CNA. (R. 26). Finally, the ALJ determined that Wade, with an RFC to perform the full range of sedentary work combined with her age, education, and work experience, was not disabled (step five). (R. 26).

Plaintiff argues that the ALJ committed legal error when she found her complaints of pain to be not entirely credible because she based part of her determination on the fact that Wade had taken a part-time job driving patients to the doctor for the two weeks before the hearing despite Wade's testimony about her pain. "We afford an ALJ's credibility determination special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). We will not normally disturb an ALJ's credibility determinations unless they are

---

[11] The ALJ noted there was some inconsistency in the plaintiff's work history since Wade testified that she stopped working on her May, 1997 onset date, while in July, 1997 she reported that she was still working as a CNA. Wade also testified she had a job driving people to the doctor two weeks prior to the hearing. However, the ALJ found Wade's work as a CNA to be an unsuccessful work attempt and that her driving job did not constitute substantial gainful activity. Thus, the ALJ found Wade met the first step of the process.

11

"patently wrong." *Zurwaski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). When "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," however, we cannot uphold the ALJ's decision. *Shramek*, 226 F.3d at 811. The ALJ's credibility determination must include reasons for the finding that are supported by record evidence and must be specific enough to show the weight the ALJ gave to the claimant's testimony. *Zurwaski*, 245 F.3d at 887 (citing Social Security Ruling 96-7p).

Here, the ALJ explained her reasons for discounting plaintiff's subjective pain allegations, including the objective medical evidence, Wade's lack of medication for severe pain, her infrequency of medical treatment[12], her daily activities, and the inconsistencies between her testimony and statements she made in other documents and to her doctors. Wade argues the ALJ placed too much negative weight on her part-time driving job in making her credibility determination. We disagree. Although the ALJ made several references to Wade's part-time driving job in her decision, this was simply additional evidence to support her conclusion that Wade was not fully credible.[13]

More importantly, the ALJ identified numerous statements by Wade that were inconsistent with the fact that she drove up to three hours every day for her part-time job.

---

[12] Plaintiff asserts the ALJ was incorrect to discredit Plaintiff for being "non-compliant with medical advice," specifically because she did not follow up with a physician. (R. 25). Plaintiff argues that she had no money and no treating physician and all of her treatment has been in emergency rooms. The record supports this assertion, however, it does not excuse the Plaintiff from the responsibility of seeking treatment whether it be in an emergency room, low-income health clinic, or at a state or county health department.

[13] Plaintiff relies on Reg. § 404.1592 for the proposition that she was entitled to a trial work period and thus the ALJ was in error to consider her work attempt against her. We construe Reg. § 404.1952 to require that the claimant must already be disabled to merit a trial work period. The Plaintiff has yet to be adjudicated disabled. *See e.g.*, *Brooks v. Apfel*, No. 97 C 6570, 1998 WL 544961 at *4 (N.D. Ill., Aug. 24, 1998).

(R. 24-25). For example, Wade alleged at various times that her medications make her so sleepy that she could not drive; she told a consultative examiner in April, 1998 that she had to stop working because she was taking too much pain medication, which made her sleepy and drowsy. (R. 22, 24, 84, 91, 97). ALJ Barezky also found Wade's part-time driving job to be inconsistent with her alleged claim in her March, 1998 Disability Reconsideration Report that transportation to and from work would be a problem because her legs go out at will. (R. 24, 78). The ALJ also found Wade's allegations of sleepiness and drowsiness to be inconsistent with her Disability Report because she did not mention these as side effects to her medications. (R. 24, 70). Indeed, although Wade alleged she had serious side effects from her medication which would significantly impair her ability to work, (R. 25, 98), she also submitted a report to the ALJ that did not list any side effects from her medication. (R. 131-32). Finally, the ALJ found it contradictory that in March, 1998 Wade wrote on a form to reconsider her request for disability payments that sometimes her joints are so tight, she is unable to take her daughter to school, (R. 81)[14] yet she testified at the hearing that she has never had to turn down a job when the owner called her to drive. (R. 25).[15]

Finally, ALJ Barezky also noted that no doctor who has examined the Plaintiff has concluded that she is unable to work. (R. 25). With respect to Wade's arthritis, the ALJ concluded her allegations of debilitating pain were not consistent with her April, 1998 statement to Dr. Toh that she has had arthritis for the last 25 years and that she

---

[14] Wade's attorney made this claim again one week prior to the hearing. (R. 98).

[15] The ALJ also found there to be several inconsistencies in the record regarding Wade's use of a cane, crutch, and knee brace. (R. 24, 82, 108, 121).

sometimes takes aspirin for the pain. (R. 25).

Plaintiff asserts the ALJ was incorrect when she stated in her decision that Wade was unable to care for herself. We agree. Wade actually stated the opposite: she was able to care for her personal needs. (R. 80). However, we do not find this error on the part of the ALJ to be sufficient to warrant a reversal or remand, as we believe substantial evidence exists for the ALJ's credibility determination and find that it was not error for the ALJ to rely on Wade's part-time driving job as additional evidence in support of her conclusions. Accordingly, we do not find the credibility determination of the ALJ to be patently wrong.

Plaintiff next contents the ALJ committed legal error with respect to her alleged mental impairments by relying on a mental status examination performed by an internist and ignoring the testimony of the SSA's medical expert, Dr. Kammerling, who testified "there may be an element of depression which would play a role here." (R. 236-37). Furthermore, Wade contends the ALJ ignored medical evidence in the record that is indicative that Wade may suffer from a mental impairment[16] and failed to take in to consideration Plaintiff's testimony at the hearing regarding her mental impairment. Plaintiff insists that the ALJ should have ordered a psychological consultative examination.

Notwithstanding, Dr. Kammerling's statements that an element of depression may

---

[16] Plaintiff points to the fact she received an intra muscular injection of Vistaril while at the emergency room in April, 1997. *Pl. Mem. Supp. Summ. J.* at 12. However, a review of the medical records on April 7, 1997 show that Wade was given an injection of Vistaril at the same time she received an intra-muscular injection of Demerol. (R. 105). Although Vistaril is used to treat anxiety disorders and tension in stressful situations, it is also used to increase the effects of other medicine, such as pain reliever (i.e., Demerol). *See*, Neil Sandow, Pharm.D., *at* http://www.rxlist.com., (last visited on February 11, 2002). Furthermore, there is no indication in the emergency room records of April 7, 1997 that Wade ever complained she was suffering from any type anxiety, stress, or other mental impairment, or that she was diagnosed as suffering from such impairment.

14

be involved, there is no substantial evidence in the record to suggest the Plaintiff was suffering from depression or any other mental impairment that would affect her ability to work. At the hearing, the plaintiff testified that her main problems were back pain and arthritis. (R. 219). The only mention of Wade possibly suffering from a mental impairment stems from her testimony at the hearing in response to a question from her attorney about stress. (R. 228). Wade replied that she worries a lot, gets frequent headaches, and suffers from nervousness, insomnia, and cries a lot. [17] (R. 229).

Contrary to Wade's argument, we do not find that the ALJ ignored evidence of a mental impairment by not giving weight to her testimony that she had headaches. Wade points out that she told Dr. Panopio that in 1978 she had her medication adjusted because her blood pressure was high and she was suffering from headaches. (R. 107). However, we do not find the fact Plaintiff was suffering from headaches twenty years ago as a result of her medication to be substantial evidence of a current mental impairment. In any event, the ALJ also concluded Wade's testimony did not provide substantial evidence of a mental impairment because Wade had sufficient memory, alertness, and concentration to enable her to drive. (R. 25). Furthermore, there was evidence from Dr. Toh that Wade did not suffer from a mental impairment, and no evidence that Wade took any medication or received therapy for a mental disorder. (R. 21-22). .

Moreover, Wade's allegations would not necessarily compel the ALJ to conclude that Wade might suffer from a mental impairment which incapacitated her or rendered her unable to perform in the "functional areas deemed essential to work." 20 C.F.R. Pt. 404,

---

[17] Plaintiff denied the existence of any psychological problems when asked during an emergency room visit on May 9, 1998. (R. 177).

Subpt. P, App. 1, sec. 12.00.[18] We are mindful that an ALJ has an obligation to develop a full and fair record. *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). "It is the claimant, however, who bears the responsibility of providing medical evidence of an impairment." *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991) (citing Reg. § 404.1504 and 404.1508). An ALJ does not have to order a consultative examination "unless they are necessary for the ALJ to make a disability determination." *Id.* Since there is no objective medical evidence that Wade suffers from a mental impairment it was not error for the ALJ not to order a consultative examination. *Id.* at 349. *Cf., Shields v. Sullivan*, 801 F. Supp. 151, 158 (N.D. Ill. 1992) (court found that ALJ was required to seek an expert evaluation of claimant's possible mental condition where evidence included two treating physician's diagnosis of depression severe enough to prevent claimant from working).

Although the ALJ did not discuss every piece of evidence or testimony she took into consideration in making her determination, an ALJ is not required to do so. *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984). We are confident that the ALJ has "built an accurate and logical bridge from the evidence to her conclusion," *Clifford v. Apfel*, 227 F.3d 863, 867 (7th Cir. 2000), thus allowing the court to "track the ALJ's reasoning and assur[ing] [us] that the ALJ considered the important evidence" before concluding that

---

[18] The functional areas listed include restriction of (1) activities of daily living, such as cleaning, shopping, cooking, paying bills, caring for one's hygiene; (2) social functioning, such as the ability to get along with others as opposed to a history of firings, or fear of strangers; (3) concentration, persistence, or pace, *i.e.*, ability to complete household tasks or locate phone numbers; and (4) ability to tolerate stress at work. Plaintiff never indicated, either in her testimony before the ALJ or in her medical and SSA records that these types of mental functional areas were impaired. Quite to the contrary, as Plaintiff points out, she is capable of caring for her personal needs. (R. 80).

Wade did not suffer from a mental impairment. *Diaz*, 55 F.3d at 306 (quoting, *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995)).

Wade next contends that the Secretary did not meet her burden of proving that she has the residual functional capacity to perform a full range of sedentary work in the national economy given her age, education, and past work experience. *See* Reg. §§ 404. 1520, 416.920. Specifically, Wade takes issue with respect to the ALJ's conclusion that Wade had no significant limitations resulting from her carpal tunnel syndrome, her headaches or her limitations on stooping. "The regulations define sedentary work as requiring primarily sitting, some walking, and standing, and minimal lifting." *Diaz*, 55 F.3d at 306; Reg. §§ 404.1567(a), 416.967(a). "A claimant can do sedentary work if he can (1) sit up for approximately six hours of an eight-hour workday, (2) do occasional lifting of objects up to ten pounds, and (3) occasionally walk or stand for no more than about two hours of an eight-hour workday." *Diaz*, 55 F.3d at 306. *See*, *Edwards v. Sullivan*, 985 F.2d 334, 339 (7th Cir. 1993).

The objective medical record supports the ALJ's finding that Wade can perform the full range of sedentary work. Although Wade's medical records show that she has moderate narrowing of the L5-S1 disc space with minimal degenerative osteophyte formation at the L4-L5 level and moderate degenerative joint disease in her left knee, no consultative or emergency room physician[19] has found Wade to be suffering from any nonexertional impairments. To the contrary, Dr. Panopio made the following conclusions regarding Wade's spine: "There was no abnormal posture. There was no paraspinal

---

[19] Although Wade does not have a personal doctor, she was assigned and treated by the same physician during her April 8-11, 1998 hospital stay and on another emergency room visit on May 10, 1998.

muscle tenderness or spasm. Lumbar bending was 80 degrees, extension was 20 degrees, lateral flexion right and left was 20 degrees, rotation right and left was 20 degrees. There was no limitation on range of motion of the cervical spine." (R. 110). Four months later, Dr. Toh found the Plaintiff to have no problems whatsoever, except that she complained of some pain in both knees when she was asked to full squat. (R. 123).

Also, on two separate occasions Wade went to Roseland Community Hospital with essentially the same complaint of right-sided flank pain. (R. 135, 177). The first time, Wade left the hospital before treatment was complete and on the second occasion she was diagnosed with a back sprain and given pain medication. (R. 182). An x-ray was also taken with no significant findings. (R. 181, 190). No emergency room physician ever diagnosed Wade as having any limitation as a result of her complaints. Wade also testified, that her back pain is severe "maybe twice a year" and other times it is only a mild pain. (R. 221).

Dr. Kammerling, who reviewed the medical evidence and testified at the hearing, concluded the Plaintiff could perform light work. (R. 235-36). Dr. Villaflor, a reviewing physician, performed an RFC assessment on Wade on January 22, 1998. Dr. Villaflor indicated that she could perform medium work. (R. 114). With respect to postural limitations, Dr. Villaflor concluded Wade could do the following frequently: (1) climbing ramp/stairs, (2) balancing, (3) stooping, and (4) crouching. (R. 115). He also concluded Wade could occasionally kneel, crawl and climb a low ladder. (R. 115). Dr. Villaflor based these finding on Dr. Panopio's examination as well as an x-ray of Wade's left knee that showed moderate degenerative joint disease. (R. 120). The ALJ however, made an even more restrictive assessment of Wade's RFC finding Wade could perform the full-range

18

of sedentary work. (R. 22).

Plaintiff asserts that is was error for the ALJ not to develop the record further as to any possible post-surgical limitations of her carpal tunnel surgery, which could have negated the ALJ's finding that Wade could perform the full range of sedentary work. The medical evidence indicates that both consultative doctors found Wade to have good bilateral handgrip and finger dexterity prior to the carpal tunnel surgery. (R. 110-11, 123). The post-operative report does not indicate any limitation because of the surgery. (R. 197). There is no evidence in the record that Wade had a follow-up visit with a doctor after the operation, and she did not testify at the hearing about any complications she had as a result of her surgery, even when the ALJ asked her about her carpal tunnel syndrome. Wade's attorney also neglected on direct and redirect examination to solicit from Wade any problems she has had with her grip and/or finger dexterity since the surgery. We again note that it is the claimant who bears the responsibility of providing medical evidence of an impairment. *Howell*, 950 F.2d at 348. We find that the ALJ did not err in further developing the record as to Wade's post-surgery hand status.

Wade additionally disputes the finding that she can perform the full range of sedentary work because she contends that she is unable to stoop or is limited in her ability to stoop. However, Wade did not testify that she had any difficulty stooping even when asked by the ALJ if there were any other difficulties that the ALJ had not covered. (R. 218). The ALJ concluded that Wade's allegation that she could not stoop was based primarily on Wade's subjective allegations, which as mentioned above, the ALJ did not find to be fully credible. Because the ALJ's credibility determination will not be disturbed

unless it is patently wrong, *Zurwaski*, 245 F.3d at 887, we hold that the ALJ did not err in discrediting Wade's claim.

In light of the previously discussed evidence, the court finds that the ALJ could conclude that Wade's allegations of pain and inability to stoop were not severe enough to prevent her from performing the full range of sedentary work. Accordingly, we find there was substantial evidence to support the ALJ's finding that Wade has the residual functional capacity to perform the full range of sedentary work.

In sum, after a thorough review of the administrative record, the Court holds that the findings and conclusions of the ALJ are based upon substantial evidence. We thus grant defendant's motion for summary judgment and deny Wade's motion for summary judgment or remand. It is so ordered.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated: February 28, 2002